# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 67

APRIL TERM, A.D. 2021

May 14, 2021

TIMOTHY DEAN LENERS,

Appellant
(Defendant),

v.                                                                  S-20-0001, S-20-0208

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*
Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General. Argument by Mr. Eames.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    A jury found Timothy Leners guilty of attempted second-degree murder after shooting Christopher Trout, despite Mr. Leners' claim he shot in self-defense.  He appeals, alleging ineffective assistance of counsel and prosecutorial misconduct.  We affirm because the overwhelming evidence of guilt presented at trial precludes the conclusion that the alleged errors were prejudicial.

## *ISSUES*

[¶2]    The issues[1] are:

1.  Did the district court err in denying Mr. Leners' motion for a new trial due to ineffective assistance of counsel?

2.  Did prosecutorial misconduct deny Mr. Leners a fair trial?

We combine these issues in our discussion because Mr. Leners' failure to demonstrate prejudice is dispositive of both claims.

## *FACTS*

[¶3]    On December 23, 2017, Timothy Leners packed his belongings in Walmart bags, left his wife and four children, and drove from Fremont, Nebraska, to Cheyenne, Wyoming.  In the early morning hours that day, his "soulmate," Joyce Trout, invited him to the apartment where she lived with her husband, Chris Trout, and her nine-year-old daughter.[2]

[¶4]    Mr. Leners arrived in Cheyenne in the late afternoon.  He planned to oust Mr. Trout from the apartment, move in, and begin life anew with Mrs. Trout.  The reunion did not go as planned.  By the end of the day, Mr. Leners had shot Mr. Trout in the center of his chest.  Mr. Leners, charged with attempted second-degree murder, claimed he shot in self-defense.  Additional facts are set forth in the discussion of the issues.

## A.    The Trial

---

[1] Mr. Leners raises a third issue challenging the award of restitution to the victim.  The State concedes this error, and we remand to the district court for the limited purpose of determining the proper amount of restitution.

[2] A little over two weeks earlier, Mrs. Trout had ended her eight-month relationship with Mr. Leners.  She and her daughter had been living with him in Fremont.  Unknown to Mr. Leners, Mrs. Trout had called her estranged husband, Mr. Trout, to come to Fremont.  Mr. Trout went to Nebraska, retrieved his wife and daughter, and they returned to Cheyenne where they rented an apartment.

[¶5]    Mr. Leners' four-day trial began on May 7, 2019. The State presented the testimony of ten witnesses and an abundance of physical evidence. The evidence included the complete videotaped interview of Mr. Leners, conducted by Detectives Hickerson and Peterson, and the complete audio recording from Mr. Leners' cell phone which he had set to record shortly after he arrived at the Trouts' apartment. It continued to record through the shooting and the arrival of the police.

[¶6]    The evidence leading up to the shooting was largely uncontroverted. Mr. Leners showed up on the doorstep of the Trouts' apartment around 5:00 p.m. He knew that Mr. Trout was not receptive to his arrival because he had spoken with Mr. Trout by cell phone on his way to Cheyenne. Mr. Leners, Mrs. Trout, and Mr. Trout sat down at the kitchen table to talk over the situation. After lengthy discussion, Mr. Trout left the apartment to run some errands. While he was gone, Mr. Leners began to move his belongings into the apartment. About this time, Mr. Trout's adult daughter, Kyla, who lived across a driveway, came to the apartment. Kyla confronted Mr. Leners about his moving into the apartment occupied by her father and Mrs. Trout, who were still married. After Kyla left, Mr. Leners complained to Mrs. Trout about what he perceived to be Kyla's disrespect. When Mrs. Trout defended Kyla, the two of them engaged in a heated argument. In the meantime, Kyla returned to her apartment and called Mr. Trout. She told him that Mr. Leners was moving in and he needed to come home right away. Then, she called the police to report that a suspicious person was in the Trouts' apartment.

[¶7]    At this point, Mr. Trout's testimony and Mr. Leners' version of events (as given to the police) diverge. According to Mr. Trout, he immediately returned home to find the doors locked. As he inserted his key, he could hear Mr. Leners and Mrs. Trout yelling at each other. As he entered the apartment, Mr. Trout joined the argument, repeatedly commanding Mr. Leners to leave. Mr. Trout recounted:

> Then we got into a little pushing match. And I opened the door and took some of his stuff and put it outside. . . . It was dark, and it was snowing. To the best of my knowledge, he took his stuff and went back to his pickup. . . .
>
> I go back in the house and grab up some of his stuff and was setting it outside. . . . Then he came back from his pickup with a gun and was holding the gun out . . . . I started backing away. . . . I slipped on the ice and fell on my back. Next thing I know, he's got the gun pointed down . . . onto my chest. I luckily somehow got the clip out of it. I had a hold of the slide . . . hard enough that the shell never ejected out of the weapon. . . . [Mr. Leners] had one leg on either side of [me] . . . [as] I was laying with my head up against the brick wall

2

. . . [and with] [m]y back . . . on the concrete . . . . [Mr. Leners] was trying to get [the gun] away from me. . . . All I heard was the gun going off and [the bullet] going through my chest.

[¶8]    In the police interview, Mr. Leners told Detective Hickerson that while he was arguing with Mrs. Trout, suddenly "the [front] door flew open and [Mr. Trout] was ON me like THAT." Mr. Trout was "hitting," "jabbing," and "picked this big chair up" to throw it at Mr. Leners' head. (Later in the interview, Mr. Leners said Mr. Trout picked up his duffel bag to throw at him.) Mr. Leners said he tried to get out the door, but Mr. Trout would not let him out. During this time, Mr. Trout was "pounding" on him and "beating the crap out" of him. The front door was open and "somehow" Mr. Trout and Mr. Leners ended up outside. (Later in the interview, he said they fell out the door when Mr. Trout jumped him.) Mr. Leners said he hit the ground face down and they began "rolling around" while Mr. Trout hit and punched him.

[¶9]    Mr. Leners said that Mrs. Trout had told him that Mr. Trout always carried at least three firearms. Given that knowledge and Mr. Trout's threats during the earlier conversation between Mr. Leners, Mr. Trout, and Mrs. Trout,[3] Mr. Leners said he believed that his life was in danger and pulled out his gun. According to Mr. Leners, Mr. Trout grabbed for the gun and as the two men struggled for the weapon, Mr. Leners saw the gun was pointed at Mr. Trout's shoulder and he pulled the trigger. Mr. Leners said, "When I got him in the shoulder," we were "on the pavement" and his shoulder "was against the wall." He said, "I couldn't get the gun away from him." "*I never got on top of him.*" (Emphasis added.) (At this point in the interview, Mr. Leners had not been told that both Mr. Trout and Mrs. Trout had independently told the police that Mr. Leners was on top of Mr. Trout when he shot down, hitting Mr. Trout in the chest.)

[¶10]  Other evidence presented to the jury revealed that Mrs. Trout, who had witnessed the shooting,[4] called 911 before going into the apartment and returning with her gun. She pointed the gun at Mr. Leners, who had remained at the front of the apartment to retrieve his things. She ordered him to get away. Mr. Leners went to his truck and placed his gun on the rail. In Mr. Leners' cell phone recording, Mr. Leners can be heard working his breathing from calm to labored as he called 911. Breathlessly, Mr. Leners reported, "I had to use my handgun to get a guy to quit beating the shit out of me."

---

[3] During that conversation, after Mrs. Trout said she loved Mr. Leners, Mr. Trout told Mr. Leners, "Congratulations," "I love her," "[y]ou f*** her up any more than she's already f***** up," "I will f****** kill you" and "they will never, ever find you."

[4] Mrs. Trout did not testify at trial. This was known to the jury through the testimony of Officer Mair and Mr. Leners' police interview.

[¶11] After the police arrived, Mr. Leners was taken to the Cheyenne Police Department where the videotaped interview was conducted. *Supra* ¶ 5. At the end of the interview, Mr. Leners was placed in custody and was later charged with attempted second-degree murder.

[¶12] On the third day of trial, the State produced Exhibit 50—an audio recording with excerpts of several calls Mr. Leners had recorded on his cell phone prior to arriving in Cheyenne. The calls comprising the exhibit were contained in a late-received supplemental report prepared by Detective Hickerson. The exhibit itself was created by Detective Hickerson the night before it was introduced at trial. The excerpts included recordings where Mr. Leners called Mr. Trout a troll, rapist, and pig. In two of the calls, he expressed a desire to kill Mr. Trout and a willingness to kill anyone who got in the way of his happiness with Mrs. Trout. The phone calls were detailed and graphic.

[¶13] The jury rejected Mr. Leners' claim of self-defense and convicted him of attempted second-degree murder. He was sentenced to between twenty-five and thirty-five years in prison. This appeal followed.

## B.      Motion for New Trial/Post-Trial Rule 21 Hearing

[¶14] Mr. Leners filed a motion for a new trial pursuant to Wyoming Rule of Appellate Procedure 21, claiming ineffective assistance of counsel. The motion was based on defense counsel's failure to properly object to discovery violations and the submission of Exhibit 50 at trial.

[¶15] On February 21, 2018, the district court entered its Criminal Case Management Order. The order, in part, required both parties to file and serve on the opposing party, "No later than fifteen (15) days prior to trial . . . b) A list, with description, of all exhibits the party intends to offer at trial."

[¶16] During discovery, on May 23, 2018, the State provided a Subsequent Certificate of Discovery which contained one hundred pages of information that defense counsel could download from the district attorney's office server. These pages included Detective Hickerson's initial report of his investigation. The report stated Detective Hickerson had received a "partial download" of Mr. Leners' cell phone contents and added:

> The contents of [Mr.] Leners' phone was quite extensive. Due to the length of the documented information from the phone, a separate, supplemental report was completed to document the relevant information obtained from the phone. Refer to the supplemental report title, "Contents of Timothy Leners' Cellular Phone" for additional information.

4

This supplemental report was not included in the one hundred pages provided to defense counsel on May 23, 2018.

[¶17] It was not until Sunday, May 5, 2019—two days before trial—that defense counsel realized the State had not provided the supplemental report. After defense counsel inquired, the State provided the supplemental report, attaching it to an e-mail. The supplemental report contained text messages and telephone calls which Detective Hickerson perceived to be important. It also contained summaries of some of these, and other general observations.

[¶18] Mr. Leners claimed ineffective assistance of counsel based on two grounds. First, with regard to the supplemental report, he alleged his defense counsel was ineffective in failing to follow up until two days before trial and in failing to object to its late production in violation of the court's Criminal Case Management Order. Second, he asserted defense counsel failed to object to the introduction of Exhibit 50, which contained the damning excerpts of telephone conversations Mr. Leners recorded before the night of the shooting. The district court held a hearing on the motion on July 16, 2020.

[¶19] After the hearing, the district court denied the Rule 21 motion, finding that Mr. Leners had not demonstrated that any potential error by counsel rendered the verdict unworthy of confidence or that the result of the trial would have been different. Mr. Leners challenges this conclusion on appeal.

[¶20] Mr. Leners also claims, for the first time on appeal, that the State's failures to follow the court's discovery and case management orders regarding the production of Detective Hickerson's supplemental report and Exhibit 50 constitute prosecutorial misconduct which resulted in prejudicial error.

## *STANDARD OF REVIEW*

### A. Ineffective Assistance of Counsel

[¶21] Mr. Leners' Rule 21 claim of ineffective assistance of counsel "present[s] mixed questions of law and fact that we review de novo." *Mills v. State*, 2020 WY 14, ¶ 19, 458 P.3d 1, 9 (Wyo. 2020) (citations omitted). "To prevail on an ineffective assistance claim, a defendant must show that his trial counsel rendered constitutionally deficient performance and that absent that deficiency, a reasonable probability exists that he would have enjoyed a more favorable verdict." *Bittleston v. State*, 2019 WY 64, ¶ 31, 442 P.3d 1287, 1295 (Wyo. 2019) (quoting *Wall v. State*, 2019 WY 2, ¶ 39, 432 P.3d 516, 527 (Wyo. 2019)). "The failure to make the required showing of either deficient performance or prejudice will result in a finding that counsel was not ineffective." *Weston v. State*,

2019 WY 113, ¶¶ 34–35, 451 P.3d 758, 768 (Wyo. 2019) (quoting *Osborne v. State*, 2012 WY 123, ¶ 19, 285 P.3d 248, 252 (Wyo. 2012)).

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Fairbourn v. State*, 2020 WY 73, ¶¶ 61–62, 465 P.3d 413, 428 (Wyo. 2020) (quoting *McNaughton v. State*, 2016 WY 112, ¶ 12, 384 P.3d 276, 278 (Wyo. 2016) (quoting *Sen v. State*, 2013 WY 47, ¶ 39, 301 P.3d 106, 121 (Wyo. 2013))).

## B.      Prosecutorial Misconduct

[¶22]  Mr. Leners claims the State's violations of the district court's discovery and case management orders constitute prosecutorial misconduct that materially prejudiced his defense.  Defense counsel did not object to late-provided discovery or the introduction of Exhibit 50.  We therefore review for plain error.  *Hicks v. State*, 2021 WY 2, ¶ 10, 478 P.3d 652, 657 (Wyo. 2021).

[¶23]  "Plain error exists if the alleged error: (1) 'clearly appears in the record'; (2) 'clearly and obviously violates a clear and unequivocal rule of law'; and (3) affects a defendant's 'substantial right to his material prejudice.'"  *Grater v. State*, 2020 WY 102, ¶ 7, 468 P.3d 1116, 1118 (Wyo. 2020) (citations omitted).  "Failure to establish each element . . . precludes a finding of plain error."  *Lewis v. State*, 2018 WY 136, ¶ 13, 430 P.3d 774, 777 (Wyo. 2018) (quoting *Jackson v. State*, 891 P.2d 70, 74 (Wyo. 1995)).  "Where appropriate, we address the prejudice element of the plain error test first, without addressing whether there has been a violation of a clear and unequivocal rule of law."  *Id.*; *Nielsen v. State*, 2018 WY 132, ¶ 23, 430 P.3d 740, 748 (Wyo. 2018); *Dumas v. State*, 2018 WY 120, ¶ 28, 428 P.3d 449, 456 (Wyo. 2018); *Miller v. State*, 2015 WY 68, ¶ 8, 350 P.3d 264, 266 (Wyo. 2015).

[¶24]  Both prosecutorial misconduct and plain error require an appellant to establish material prejudice to warrant reversal.  *Bogard v. State*, 2019 WY 96, ¶ 71, 449 P.3d 315, 332 (Wyo. 2019).  "[T]he appellant must establish he suffered material prejudice from the error by demonstrating it is reasonably probable he would have received a more favorable verdict if the error had not been made."  *Weston*, ¶¶ 34–41, 451 P.3d at 768–69 (citing *Sindelar v. State*, 2018 WY 29, ¶ 20, 416 P.3d 764, 770 (Wyo. 2018) (plain error); *Farrow v. State*, 2019 WY 30, ¶ 72, 437 P.3d 809, 827 (Wyo. 2019) (ineffective assistance of counsel)); *see also Bogard*, ¶¶ 71–72, 449 P.3d at 332 (prosecutorial misconduct).  Mr. Leners, therefore, "must show prejudice under 'circumstances which

manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'" *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015) (quoting *Phillips v. State*, 2007 WY 25, ¶ 8, 151 P.3d 1131, 1134 (Wyo. 2007)).

## *DISCUSSION*

[¶25] The dispositive element for both Mr. Leners' claim of ineffective assistance of counsel and prosecutorial misconduct is prejudice. On his claim of prosecutorial misconduct, Mr. Leners urges this Court to shift the burden to the State to show the admission of the evidence was not prejudicial. He cites to the concurring opinions in *Schreibvogel v. State*, 2010 WY 45, ¶ 54, 228 P.3d 874, 890–91 (Wyo. 2010) (Voigt, C.J., concurring) and *McGinn*, ¶ 47, 361 P.3d at 305–06 (Fox, J., and Kite, J. (Ret.), concurring). We do not address shifting the burden here, where our review of Mr. Leners' prosecutorial misconduct claim is for plain error.[5]

[¶26] The fact Mr. Leners shot Mr. Trout is undisputed. The questions are whether the State's failure to timely provide the supplemental report of Mr. Leners' telephone conversations and the admission of Exhibit 50, without objection, prejudiced his claim of self-defense. While we do not condone the performance of the prosecution or the defense, neither the late production of the supplemental report nor the admission of Exhibit 50 prejudiced Mr. Leners. The physical and recorded evidence defeated any claim of prejudice at trial.

[¶27] Mr. Trout, as recounted above, testified that he was on his back when Mr. Leners shot him. Responding Officer Mair testified that he spoke with Mrs. Trout at the scene. She told him that Mr. Trout was on his back when he was shot.

---

[5] While the concurrence in *McGinn* would have shifted the burden, it pointed out that even were the burden to shift, it would not shift under a plain error analysis:

> Federal courts distinguish between the burden of showing harmless error under F.R.Cr.P. 52(a), which is imposed on the government, and the burden of showing prejudice occurred under the F.R.Cr.P. 52(b) plain error standard, in which case it "is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) (applying the plain error standard). *See also United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011) ("[W]hen a defendant fails to object to an allegedly improper statement during trial, we will 'review only for plain error and it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.'" (citation omitted)).

*McGinn*, ¶ 43, 361 P.3d at 304–05 (Fox, J., and Kite, J. (Ret.), concurring) (footnote omitted).

7

[¶28] In contrast, Mr. Leners told Officer Lewis[6] that Mr. Trout arrived back home while Mr. Leners was moving his belongings back out to his truck. He stated that Mr. Trout immediately attacked him, yelling at him about how he had disrespected his daughter. According to Mr. Leners, Mr. Trout was initially just pushing and shoving but soon grabbed Mr. Leners and threw him to the ground. At that point, Mr. Leners told Officer Lewis that he knew if he went to the ground, he was going to die. He felt his firearm was his only choice, and he had to use it to defend himself.

[¶29] During the police interview, Mr. Leners told several inconsistent stories and none of those were entirely consistent with the version of events he gave to Officer Lewis. First, he said that while he was in the apartment, Mr. Trout immediately attacked him and began beating him "all over" and was hitting him "everywhere." But later in the interview, Mr. Leners said the actual fight did not begin until the two men tumbled outside. Although Mr. Leners repeatedly said he was punched and hit everywhere, when confronted with his lack of injury, he said Mr. Trout never hit his face and the "beating" was more like "close body contact." At one point, Mr. Leners told Detective Hickerson he could not remember how the two men got outside. Later, he said Mr. Trout "jumped him" and he landed face down on the snow. A bit later, however, he told Detective Hickerson that his back hurt from his fall out the door. Mr. Leners did not acknowledge there was a break in the confrontation while Mr. Trout tossed his belongings out the door. However, Mr. Leners inadvertently conceded that point when he told Detective Hickerson that Mr. Trout "had thrown sh*t all over the place outside."

[¶30] The cell phone recording tracks Mr. Trout's testimony but does not comport with any of Mr. Leners' differing accounts of what occurred inside the apartment after Mr. Trout arrived home. All of Mr. Leners' versions rely on his description of a severe beating and a fight for his life. However, no part of the cell phone recording supports an inference of dodging or receiving blows. The cell phone recording, likewise, cannot be reconciled with any of Mr. Leners' reports on what occurred outside the apartment. Each version of Mr. Leners' interviews includes that he was punched and hit everywhere and that Mr. Trout threw him to the ground. However, the recording does not support his accounts and only seconds elapse before Mr. Trout yells, "He shot me." Mrs. Trout screams, "Where?" Mr. Trout says, "In the chest."

[¶31] Finally, the recording is clear. Mr. Leners' breathing was normal when, after he shot Mr. Trout, he asked to gather his things and told Mr. Trout to calm down. Moments later, Mr. Leners' efforts to excite his breathing in preparation for his 911 call are unmistakable.

---

[6] Officer Lewis was the first to testify regarding Mr. Leners' description of the shooting. Officer Lewis testified Mr. Leners was placed in the back seat of a squad car shortly after officers arrived. Mr. Leners said he wanted to tell his side of the story after Officer Lewis informed him of his rights.

[¶32]  Mr. Leners' defense fared no better with the physical evidence.  On the night of Mr. Leners' police interview, other than a bruise on his wrist above the hand that held the gun, Mr. Leners bore "no physical signs that an altercation occurred."[7]  The evidence collected at the scene—a pool of blood in the snow and an "impact mark from a bullet" in the location where Mr. Trout said he fell and lay on his back—corroborate Mr. Trout's testimony that he was shot while on the ground with Mr. Leners standing over him.

[¶33]  We agree with the district court's conclusion that the evidence "doomed" Mr. Leners' argument that he acted in justifiable self-defense.  While the statements in Exhibit 50 were most certainly not helpful to Mr. Leners' defense, the evidence which preceded this exhibit had already secured the verdict.  *See, e.g.*, *Weston*, ¶ 41, 451 P.3d at 769 (there was no prejudice where the "evidence against [the defendant] was overwhelming and there was no reasonable probability he would have received a more favorable verdict if the jury had been instructed correctly").

## *CONCLUSION*

[¶34]  The evidence at trial devastated Mr. Leners' justification of self-defense to charges of attempted second-degree murder.  The late-produced supplemental report and the introduction of Exhibit 50 without objection did not prejudice the verdict.  His conviction is affirmed.  We remand the case for the limited purpose of determining appropriate restitution.

---

[7] Registered Nurse Jessica Eastman examined Mr. Leners twelve days after the shooting.  Her examination revealed some bruising on Mr. Leners' left chest, left arm, and left inner leg.