# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 119

APRIL TERM, A.D. 2022

September 27, 2022

TERRY DEAN ANDERSON,

**Appellant**
**(Defendant),**

**v.**                                                    S-21-0213

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Goshen County*
*The Honorable F. Scott Peasley, Judge*

*Representing Appellant:*
Donna D. Domonkos, Domonkos & Thorpe, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames*, Senior Assistant Attorney General.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, JJ., and TYLER, D.J.*

* An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**TYLER, District Judge.**

[¶1]    A jury found the Appellant, Terry Dean Anderson ("Anderson"), guilty of second-degree murder for the shooting death of his significant other, Deedra Strauch ("Strauch" or "victim").  Anderson challenges his conviction, arguing that: the district court abused its discretion when it admitted a certain text message under W.R.E. 404(b); the trial court abused its discretion by permitting the State's forensic pathologist to opine as to the victim's manner of death; and, the prosecutor committed prosecutorial misconduct by repeatedly asking the State's witnesses improper, leading questions on direct examination. Finding no error, we affirm.

*ISSUES*

[¶2]    We state the issues as follows:

  I.      Whether the district court abused its discretion when it admitted the October 26, 2019 text message under W.R.E. 404(b).

  II.     Whether the district court abused its discretion by permitting the State's forensic pathologist to testify the victim's manner of death was homicide.

  III.    Whether plain error occurred when the prosecutor asked several leading questions on direct examination.

*FACTS*

[¶3]    On January 24, 2020, the Goshen County Sheriff and the Undersheriff responded to a 911 call reporting a shooting in Torrington.  At the scene they found Anderson and Strauch inside of a mobile home.  The seriously injured Strauch was lying on the kitchen floor.  Anderson told them Strauch was his girlfriend, and that she had been shot in the head.  Anderson also explained that he and Strauch were arguing when he fell upon a rifle, causing it to accidentally discharge.  Strauch died two days later.  Anderson was ultimately charged with second-degree murder in violation of Wyo. Stat. Ann. § 6-2-104.

*I.      Pretrial W.R.E. 404(b) Proceedings*

[¶4]    Prior to trial, Anderson filed a demand for notice of the State's intent to introduce evidence under W.R.E. 404(b).  The State filed its notice of intent under W.R.E. 404(b) seeking to introduce an October 26, 2019 text message inadvertently sent by Anderson to his friend/acquaintance, Rorick Baros ("Baros"), for the purposes of showing course of conduct, opportunity, motive, intent, plan, and lack of mistake.  The text message predated the shooting by nearly three months.

1

[¶5]    The district court held a pretrial hearing based upon the State's notice.  At the hearing, the State called Baros to testify.  Baros described his communications with Anderson using text messages.  He testified that Anderson had inadvertently sent him a text message on October 26, 2019.  The text stated: "Well D I should have shot that first round at you but I didn't want to take a chance of dog my dog your dog your dog you are a piece of shit."  Baros recalled that "D" referred to Strauch, whom he understood was Anderson's significant other.  Anderson's counsel opposed the admission of the text message, arguing it shows inadmissible character evidence, lacks the proper context to be relevant, and is overly prejudicial.

[¶6]    After performing a full *Gleason* analysis,[1] the district court later issued an 11-page *Order on State's Motion to Introduce Evidence Pursuant to W.R.E. 404(b)*, finding and concluding that the October 26, 2019 text message would be admissible pursuant to W.R.E. 404(b) only for the proper purposes of showing course of conduct, intent, motive, and lack of mistake.  It found the text message was relevant because Anderson described how he "should" have shot the victim, and that three months later Anderson was charged with shooting the victim.  In weighing the probative value against the text message's prejudicial effect, the district court acknowledged the text message's similarity to the crime charged could lead to an improper inference by the jury; however, it determined Anderson's text message stating that he "should" have shot the victim is less reprehensible than the crime charged and it is not so similar to the crime charged that the text is likely to be used improperly.  The district court found the text message would more likely be used by the jury to understand Anderson's relationship with the victim.  The district court also ruled that Anderson had a right to a limiting instruction, which was given at trial.

## II.    The Trial

[¶7]    Anderson's four-day jury trial began on March 1, 2021.  During trial, the State presented seven witnesses, including Undersheriff Doug Patrick and Sheriff Kory Fleenor, who testified to responding to the 911 call, finding Anderson and the victim at the scene, and their investigation of the shooting incident.  The State also called: Deputy Edwin Ochoa who testified to his investigation and collection of certain evidence at the scene; Leah Innocci, a fingerprint analyst from the Wyoming State Crime Lab, who testified that she did not find any useable fingerprints on the gun; Kathryn Bacon, the State's firearms expert from the Wyoming State Crime Lab, who testified that the gun could discharge if dropped, but only if it were "cocked"; and, Baros who testified about the October 26, 2019 text message.  Anderson's counsel continued to object to the admission of the text message.

[¶8]    The State also called forensic pathologist, Dr. Peter Schilke, as an expert witness.  Dr. Schilke performed the autopsy on the victim, and he produced a report containing his conclusions.  He testified that the victim's head wound contained evidence of soot and gun

---

[1] *See Gleason v. State*, 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002).

2

powder, which he concluded was evidence of a "contact wound" from the barrel of a gun being pressed against the skin. Anderson's counsel objected to Dr. Schilke testifying as to how the gun barrel may have been held against the victim's head. The district court overruled the objection, but allowed defense counsel to *voir dire* the witness. Anderson's counsel asked Dr. Schilke whether he knew "exactly how [the gun] was fired … whether it was held at all, or whether [the victim] fell upon [the gun barrel.]" Dr. Schilke agreed the gunshot wound could be self-inflicted or accidental, but his conclusion was that the manner of death was a homicide. Over defense counsel's continued objection, Dr. Schilke resumed his testimony and he discussed how the victim's manner of death could be either "[n]atural, accident, suicide, homicide, or undetermined." He further stated that "[c]ontact wounds can have different manners of death … [and] can be variable depending on the circumstances." Dr. Schilke testified that he considered Anderson's claim that the gun was accidentally discharged, but he concluded the "story doesn't really match up with a contact wound." At the end of his testimony, Dr. Schilke stated that he "ruled the manner [of death] as a homicide." The district court gave a limiting instruction regarding Dr. Schilke's testimony.

[¶9] The defense presented two witnesses. The first witness was Ryan Allen, the defense's firearms expert, who testified as to the relative ease with which the rifle may discharge. The next witness was Anderson, who described the circumstances as to how the rifle had accidentally discharged after he fell upon it and he also described the bullet striking Strauch.

[¶10] The jury found Anderson guilty of second-degree murder. The district court entered a conviction against him and sentenced Anderson to 28 to 42 years in prison. Anderson filed a timely notice of appeal.

## DISCUSSION

### I. The district court did not abuse its discretion when it allowed the October 26, 2019 text message to be admitted at trial as other acts evidence.

[¶11] Anderson filed a pretrial demand for notice of the State's intent to introduce evidence under W.R.E. 404(b). This Court treats the demand as an objection, and will review the admission of other acts evidence for an abuse of discretion. *Barrett v. State*, 2022 WY 64, ¶ 41, 509 P.3d 940, 948 (Wyo. 2022) (citing *Mayhew v. State*, 2019 WY 38, ¶ 23, 438 P.3d 617, 623 (Wyo. 2019)). "Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence." *Klingbeil v. State*, 2021 WY 89, ¶ 32, 492 P.3d 279, 286 (Wyo. 2021) (quoting *Spence v. State*, 2019 WY 51, ¶ 42, 441 P.3d 271, 282 (Wyo. 2019)). "We will not disturb the trial court's determination of the admissibility of evidence unless the court clearly abused its discretion." *Id.* (citing *Spence*, ¶ 42, 441 P.3d at 282). "We need only determine whether the court could have reasonably

concluded as it did." *Id.* (citing *Hardman v. State*, 2020 WY 11, ¶ 11, 456 P.3d 1223, 1227 (Wyo. 2020)).

[¶12]   The admissibility of other acts evidence is governed by W.R.E. 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

W.R.E. 404(b).

[¶13]   The State filed a notice of intent to introduce evidence under W.R.E. 404(b), which triggered a *Gleason* hearing. *Jackson v. State*, 2021 WY 92, ¶ 10, 492 P.3d 911, 916 (Wyo. 2021) (citing *Putnam v. State*, 2020 WY 133, ¶ 31, 474 P.3d 613, 622 (Wyo. 2020)). "Our precedent mandates a procedure for the district court to follow and factors for it to consider in deciding whether to admit evidence of other crimes, wrongs, or acts." *Barrett*, ¶ 45, 509 P.3d at 949 (citing *Mayhew*, ¶ 25, 438 P.3d at 623).  To be admissible:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Id.* ¶ 45, 509 P.3d at 949–50 (quoting *Mayhew*, ¶ 25, 438 P.3d at 623).  "Evidence is not relevant and admissible under Rule 404(b) 'if the thrust of the evidence is only to demonstrate that the defendant has a disposition to commit crimes.'" *Swett v. State*, 2018 WY 144, ¶ 23, 431 P.3d 1135, 1142 (Wyo. 2018) (quoting *Gleason*, ¶ 17, 57 P.3d at 340).

[¶14]   Further, the district court must consider several factors in weighing the probative value of the evidence against its potential for unfair prejudice:

The district court should consider the following five factors to determine the probative value of the evidence:

1. How clear is it that the defendant committed the prior bad act?

2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?

3. Is other evidence available?

4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

The district court should then weigh the following six factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Barrett*, ¶¶ 46–47, 509 P.3d at 950 (quoting *Mayhew*, ¶ 26, 438 P.3d at 623–24).

[¶15] This Court does not apply the above analytical framework anew on appeal. *Id.* ¶ 48, 509 P.3d at 950 (citing *Mayhew*, ¶ 27, 438 P.3d at 624). Rather, "[w]e determine whether the district court abused its discretion in considering the factors." *Id.* (citing *Mayhew*, ¶ 27, 438 P.3d at 624). If the district court provided a legitimate basis for its decision, we will not disturb it on appeal. *Id.* (citing *Mayhew*, ¶ 23, 438 P.3d at 623). As the appellant, Anderson has the burden to show an abuse of discretion. *Id.* (citing *Mayhew*, ¶ 23, 438 P.3d at 623).

[¶16] Anderson first suggests the State proffered, and the district court adopted, a "shotgun approach" to the admission of the other acts evidence. This Court proscribes "[t]he 'shotgun approach' of listing every conceivable purpose for admissibility, followed by a bald statement that probative value outweighs prejudicial effect will no longer be sufficient." *Klingbeil*, ¶ 35, 492 P.3d at 287 (quoting *Gleason*, ¶ 30, 57 P.3d at 343). However, "the district courts are not required to pinpoint only one proper purpose for the admission of evidence." *King v. State*, 2013 WY 156, ¶ 11, 315 P.3d 639, 646 (Wyo. 2013) (citing *Rolle v. State*, 2010 WY 100, ¶ 15 n.3, 236 P.3d 259, 268 n. 3 (Wyo. 2010); *Sturgis v. State*, 932 P.2d 199, 203 (Wyo.1997)); *see also Garrison v. State*, 2018 WY 9, ¶ 26, 409 P.3d 1209, 1217 (Wyo. 2018).

[¶17] Here, the district court identified course of conduct, intent, motive, and lack of mistake as the proper purposes for which the evidence was being offered. Although the court did not specifically analyze each possible proper purpose, it provided a reasoned basis for limiting the proper purposes that the text message would be admissible under W.R.E. 404(b) at trial. It explained that the text message was intended for the victim, that Anderson's declaration that he should have shot the victim was sent three months prior to him being charged for shooting the victim, and that the text message "would enhance the natural development of the facts." The district court followed the same reasoning for finding the text message relevant.

[¶18] The district court then addressed each of the probative value factors articulated in *Gleason*, stating:

> There is no real dispute that the Defendant sent the message. His name is identified in the screenshot, and the witness testified that it was the Defendant's phone number. The Defendant does not necessarily dispute that the message came from him. The State explained that there was no other evidence

6

available, making this particular piece of evidence probative and not unnecessarily cumulative. To the court's knowledge, there is no other similar evidence being offered other than evidence of the crime itself. And finally, approximately 3 months elapsed from the date of the message to the time of the alleged shooting.

[¶19] In weighing the text message's probative value against the prejudice factors, the district court recognized that the text message's similarity to the crime charged "makes it somewhat more likely that the jury could use it improperly," but that the similarity was not so strong that it made the text message too likely to be used improperly. The district court also reasoned the text message was far less reprehensible than second-degree murder, and the jury would not be tempted to punish Anderson for sending the text. Further, the district court considered the text message highly probative because: it stated that Anderson "should" have shot the victim; the State alleged Anderson had shot the victim; and, the text was evidence of intent, motive, course of conduct, and lack of mistake. The district court then found that the text message "would more likely be used by the jury to understand the relationship between [Anderson] and [the] victim than it would to draw improper inferences."

[¶20] "After a careful review of the factors as described above," the district court held the probative value of the evidence outweighs the danger of any unfair prejudice, and that the October 26, 2019 text message could be introduced under W.R.E. 404(b). The record shows the district court appropriately analyzed the other acts evidence, and it provided a reasoned basis for its ruling. Anderson's arguments to the contrary fail to show otherwise.

[¶21] Anderson asserts that the October 26, 2019 text message has no connection to the crime charged because no context for it was offered, thereby rendering the text message inadmissible for lack of foundation and lack of relevance. He also argues that the lack of context does not support using the text message for the purpose of motive or lack of mistake. Further, Anderson contends the text message does not reveal a course of conduct or intent because it was merely a single past incident. Anderson adds that the text message cannot be used to show intent because it only shows an intent in the past, not a future intention.

[¶22] We have stated that "when intent is at issue, evidence of several similar, prior acts may be admissible." *Swett*, ¶ 27, 431 P.3d at 1143 (quoting *Wimbley v. State*, 2009 WY 72, ¶ 16, 208 P.3d 608, 612 (Wyo. 2009)). Further, "[e]vidence of prior threats and assaults may be admissible to prove motive and intent." *Bhutto v. State*, 2005 WY 78, ¶ 24, 114 P.3d 1252, 1263 (Wyo. 2005) (citations omitted); *see also Klingbeil*, ¶ 38, 492 P.3d at 287. "Motive is generally defined as that which leads or tempts the mind to indulge in a particular act." *Barrett*, ¶ 49, 509 P.3d at 951 (quoting *Mayhew*, ¶ 31, 438 P.3d at 627). "Although motive is not an element of any charged crime, it is an intermediate fact that the

7

prosecution is permitted to prove." *Id.* Additionally, "in order to be relevant to the issue of intent and counter a defense of accident, the other bad act must be similar to the charged crime." *Swett*, ¶ 27, 431 P.3d at 1143 (citing *Goodman v. State*, 601 P.2d 178, 182 (Wyo. 1979)). Thus, evidence of motive and intent does not need to convey a future intention as Anderson suggests, but rather the evidence must have sufficient similarity with the crime charged. *See id.* ¶ 41, 431 P.3d at 1146 (finding insufficient similarities between a jail incident and the charged child abuse to demonstrate motive or intent); *see also Klingbeil*, ¶ 38, 492 P.3d at 287.

[¶23] The same is true to show lack of mistake. *See Klingbeil*, ¶ 38, 492 P.3d at 287. In *Klingbeil*, the defendant was charged with first-degree murder for shooting his wife in the head. *Id.* ¶ 1, 492 P.3d at 281. The defendant claimed he shot his wife by accident. *Id.* The State sought to admit uncharged misconduct evidence of a prior incident where the victim called 911 because the defendant kept a loaded pistol on a dining room table in an implicitly threatening manner while the two were arguing. *Id.* ¶¶ 24, 26, 492 P.3d at 285. The district court determined the prior incident was sufficiently similar to the crime charged for the purpose of showing intent and lack of mistake. *Id.* ¶ 38, 492 P.3d at 287. After conducting the *Gleason* analysis, the district court found the uncharged misconduct evidence was admissible. *Id.* ¶¶ 36–38, 492 P.3d at 287. This Court held there was "no clear abuse of discretion in the court's determination." *Id.* ¶ 38, 492 P.3d at 287.

[¶24] Here, as in *Klingbeil*, Anderson claimed he shot the victim in the head by accident. The State then sought to offer the October 26, 2019 text message. At the *Gleason* hearing, the State called a witness who provided some context for the text message. The district court provided its findings from that testimony in its *Order*: Baros, the witness, knew Anderson and the victim; he knew they were fighting; and, he knew the text came from Anderson. Further, the district court determined the text message was three months before the crime charged, and that Anderson stating he "should have shot that first round" at the victim was sufficiently similar to the second-degree murder charge so as to be relevant. The district court reasonably concluded the October 26, 2019 text message was relevant for the proper purposes of intent, motive, and lack of mistake.

[¶25] Anderson also contends that the single October 26, 2019, text message does not show a course of conduct for purposes of W.R.E. 404(b). "[E]vidence of [other acts] is admissible if it forms part of the history of the event or serves to enhance the natural development of the facts." *Garrison*, ¶ 27, 409 P.3d at 1217 (quoting *Vasquez v. State*, 2016 WY 129, ¶ 13, 386 P.3d 350, 355 (Wyo. 2016)). This Court has explained that "[e]vents do not occur in a vacuum and the jury has the right to have the offense placed in its proper setting." *Id.* (quoting *Bromley v. State*, 2007 WY 20, ¶ 21, 150 P.3d 1202, 1209 (Wyo. 2007)). However, "[w]e recognize the danger that a course of conduct exception, standing alone, could swallow the general rule against admission of 'other crimes, wrongs, or acts,' and we emphasize that it must be linked to another legitimate purpose." *Moser v. State*, 2018 WY 12, ¶ 36, 409 P.3d 1236, 1247 (Wyo. 2018) (quoting *Garrison*, ¶ 29, 409

P.3d at 1217–18). Although the text message was a single act, the district court determined that it enhanced the natural development of the facts regarding the relationship between Anderson and the victim. As discussed above, the district court also found the text message was relevant for the proper purposes of intent, motive, and lack of mistake. Thus, the district court linked course of conduct to other legitimate purposes.

[¶26] The record in this matter demonstrates the district court appropriately analyzed the *Gleason* factors, and it articulated a legitimate basis for admitting the October 26, 2019 text message. The district court did not abuse its discretion.[2]

## II. The district court did not abuse its discretion when it allowed the forensic pathologist to testify the victim's manner of death was homicide.

[¶27] Anderson claims that the district court abused its discretion when, over his objection, it permitted the State's forensic pathologist to testify that the victim's manner of death was homicide. Again, "[e]videntiary rulings are within the sound discretion of the trial court[.]" *Klingbeil*, ¶ 32, 492 P.3d at 286 (quoting *Spence*, ¶ 42, 441 P.3d at 282). "When an issue regarding the admissibility of evidence is presented to the district court, we review its decision for abuse of discretion." *Swett*, ¶ 11, 431 P.3d at 1140 (citing *Triplett v. State*, 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017); *Garland v. State*, 2017 WY 102, ¶ 24, 401 P.3d 480, 487 (Wyo. 2017)). If we find the expert's opinion testimony was allowed in error, we then consider whether the error was prejudicial. *Id.* ¶ 12, 431 P.3d at 1140 (citing *Foster v. State*, 2010 WY 8, ¶ 4, 224 P.3d 1, 4 (Wyo. 2010); W.R.Cr.P. 52)). "An error is deemed prejudicial when there is a reasonable probability that, in the absence of the improper evidence, the verdict would have been more favorable to the appellant." *Id.* (citing *Bustos v. State*, 2008 WY 37, ¶ 9, 180 P.3d 904, 907 (Wyo. 2008)).

[¶28] Anderson contends there were two competing theories for the victim's manner of death: intentional homicide or accident. He maintains that Dr. Schilke's opinion that the victim's manner of death was homicide was improper because it invaded the province of the jury as the finder of fact.[3]

[¶29] We have stated that:

> It is well established that it is the jury's role to determine the
> guilt of the accused and a witness may not express an opinion

---

[2] Because we find the district court did not abuse its discretion in admitting other acts evidence, we do not need to consider whether the admission of the October 26, 2019 text message unfairly prejudiced Anderson.
[3] Anderson also objected to Dr. Schilke's testimony for failing to meet the standards for admission of expert testimony established in *Daubert*. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Bunting v. Jamieson*, 984 P.2d 467 (Wyo. 1999). The district court overruled the objection. Anderson did not raise this issue on appeal, and therefore we will not address it.

9

as to his guilt. Although it is proper under W.R.E. 704 for an opinion to embrace[ ] an ultimate issue to be decided by the trier of fact, it is the jury's duty to resolve the factual issues and ultimately determine guilt or innocence. The inquiry as to whether expert testimony is proper must focus upon whether the expert testimony serves to assist the jury in resolving the factual issues before it. Opinion testimony about guilt does not address areas that assist the jury in resolving factual issues. However, [t]estimony need not be excluded unless it contains an actual conclusion about the guilt or innocence of the accused party, and a witness may interpret evidence even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt.

*Klingbeil*, ¶ 41, 492 P.3d at 288 (quoting *Nielsen v. State*, 2018 WY 132, ¶ 26, 430 P.3d 740, 748–49 (Wyo. 2018) (internal citations and quotation marks omitted)).

[¶30]   Our reasoning in *Nielsen* is dispositive. In *Nielsen*, the defendant was convicted of first-degree felony murder for causing the death of a three-year-old child. *Nielsen*, ¶ 1, 430 P.3d at 741. He claimed the child injured himself "while trying to jump off [a] coffee table." *Id.* ¶ 4, 430 P.3d at 742. One of the child's doctors ordered a CT-scan which showed the child "had a skull fracture, a subdural hematoma, and several rib fractures in various stages of healing." *Id.* ¶ 6, 430 P.3d at 742. Another doctor called by the State testified that the child's injuries made them "suspicious that this was nonaccidental trauma," meaning an "inflicted injury." *Id.* ¶ 7, 430 P.3d at 743. A third physician testified as to his concerns about the reported cause of injury stating, "things were most consistent with an abusive head injury." *Id.* ¶ 9, 430 P.3d at 744. The State also called a pediatric nurse practitioner who was part of the child's medical team before his death. *Id.* ¶ 11, 430 P.3d at 744. When the State asked her about the child's diagnosis, she responded:

A. My diagnosis was that [the child] had multiple bruising, or bruises in multiple planes of his body. He had brain swelling, also called cerebral edema, as well as subdural hemorrhage, which is bleeding around the brain. He had a fracture of his right mandible, or the jaw, as well as two rib fractures, one was acute, or new, and one was healing. **And that that constellation of injuries was consistent with child physical abuse, or non-accidental trauma, which are synonymous**.

Q. So if we hear "non-accidental trauma" that's synonymous with "child physical abuse"?

A. Yes, sir.

10

> Q. Okay. So in your opinion, [the child's] injuries were consistent with child abuse?
>
> A. Yes, sir.

*Id.* ¶ 11, 430 P.3d at 744–45 (emphasis added). Further, the State called a forensic pathologist. *Id.* ¶ 13, 430 P.3d at 746. When the State asked about the child's cause of death, the forensic pathologist testified that "[t]his child died of closed head injuries due to a physical assault." *Id.*

[¶31] On appeal, Nielsen challenged the experts' testimony as stating legal conclusions of guilt, resulting in material prejudice. *Id.* ¶ 24, 430 P.3d at 748. We found the medical experts did not improperly tailor their testimony to the crime charged; "rather, they drew their language from medical diagnoses arrived at from observation and interpretation of [the child's] injuries." *Id.* ¶ 32, 430 P.3d at 750. The "medical experts properly informed the jury about the meaning and significance of medical evidence using accepted medical methodology." *Id.* ¶ 34, 430 P.3d at 751. Additionally, we held that the experts' medical opinions regarding the child's manner of death did "not equate to expressing an opinion as to Mr. Nielsen's guilt" and "the district court did not err in permitting the challenged testimony." *Id.* ¶¶ 34–35, 430 P.3d at 751–52.

[¶32] Similar to the experts' testimony in *Nielsen*, Dr. Schilke testified the manner of the victim's death was homicide. He did not provide an opinion regarding Anderson's actual guilt or innocence. Instead, Dr. Schilke justified his opinion as to the manner of death by discussing what he observed during the autopsy, which included evidence of a contact wound on the victim's head.[4] Further, while Dr. Schilke acknowledged the manner of death could have been accidental, he also qualified that testimony by stating that the "story doesn't really match up with a contact wound." Accordingly, Dr. Schilke's opinions "merely informed the jury about the meaning and the significance of the evidence presented." *Carter v. State*, 2012 WY 109, ¶ 12, 282 P.3d 167, 170 (Wyo. 2012) (citing *Cureton v. State*, 2007 WY 168, ¶ 11, 169 P.3d 549, 551 (Wyo. 2007)); *Nielsen*, ¶ 34, 430 P.3d at 751.

[¶33] The district court did not abuse its discretion when it allowed Dr. Schilke to testify that the manner of the victim's death was homicide.[5]

---

[4] Anderson concedes in his brief that "Dr. Schilke did have grounds to support his finding that the manner of death was homicide because of the contact wound."

[5] Because we find that the district court did not abuse its discretion in admitting Dr. Schilke's opinions and conclusions as to the manner of the victim's death, we do not need to consider whether this testimony unfairly prejudiced Anderson.

11

***III.*** ***No prosecutorial misconduct occurred when the prosecutor asked witnesses leading questions on direct examination.***

[¶34] Anderson charges that the prosecutor committed prosecutorial misconduct by: asking witnesses leading questions during direct examination; testifying through his leading questions by stating his personal beliefs and referring to facts not in evidence; and impermissibly bolstering his witnesses by having them agree with him through his questions.

[¶35] Anderson "bears the burden of establishing prosecutorial misconduct." *Mendoza v. State*, 2021 WY 127, ¶ 12, 498 P.3d 82, 85 (Wyo. 2021) (quoting *Armajo v. State,* 2020 WY 153, ¶ 32, 478 P.3d 184, 193 (Wyo. 2020)). Because Anderson did not object to all but one of the prosecutor's leading questions at trial, we review for plain error.[6] *Id.* ¶ 12, 498 P.3d at 85 (citing *Ridinger v. State*, 2021 WY 4, ¶ 32, 478 P.3d 1160, 1168 (Wyo. 2021)). "To satisfy the plain error standard, [Anderson] must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice." *Ingersoll v. State*, 2022 WY 74, ¶ 9, 511 P.3d 480, 484 (Wyo. 2022) (quoting *Mendoza*, ¶ 12, 498 P.3d at 85) (internal quotations omitted). "Failure to establish each element ... precludes a finding of plain error." *Leners v. State*, 2021 WY 67, ¶ 23, 486 P.3d 1013, 1018 (Wyo. 2021) (quoting *Lewis v. State*, 2018 WY 136, ¶ 13, 430 P.3d 774, 777 (Wyo. 2018)).

[¶36] The first prong of plain error review is satisfied because the alleged improper leading questions are clearly reflected in the record. To satisfy the second prong of plain error review, Anderson "must demonstrate the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way." *Ingersoll*, ¶ 10, 511 P.3d at 484 (quoting *Ridinger*, ¶ 34, 478 P.3d at 1168). Anderson asserts the prosecutor's leading questions transgressed three rules: (1) the rule against leading questions on direct examination under W.R.E. 611(c); (2) the rule that prosecutors cannot imply they have independent knowledge of the facts; and, (3) the rule against prosecutors injecting their personal beliefs as to the credibility of evidence.

[¶37] W.R.E. 611(c) states, in part, that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." We have acknowledged "that Rule 611(c) contains 'words of suggestion, not command.'" *Pena v. State*, 792 P.2d 1352, 1355 (Wyo. 1990) (quoting *United States v. DeFiore*, 720 F.2d 757, 764 (2nd Cir. 1983) *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984)). As such, "[l]eading questions are not, per se, impermissible." *Duke v. State*, 2004 WY 120, ¶ 65, 99 P.3d 928, 949 (Wyo. 2004) (quoting *Pena*, 792 P.2d at 1355). Like its federal analogue, W.R.E. 611(c) "is not a bar to either side's occasional use of leading

---

[6] The district court sustained Anderson's sole objection to "hearsay" based upon the witness's partial answer to the prosecutor's leading question.

questions during direct." *Pena*, 792 P.2d at 1355 (citing *United States v. Hewes*, 729 F.2d 1302, 1325 (11th Cir. 1984), *cert. denied sub nom.*, *Caldwell v. United States*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985)). Trial courts have "broad discretion on whether or not to allow leading questions." *Id.*

[¶38] However, when asking leading questions, "[a] prosecutor should not suggest that he has independent knowledge of facts that could not be presented to the jury." *Talley v. State*, 2007 WY 37, ¶ 21, 153 P.3d 256, 263 (Wyo. 2007) (citing *State v. Ceballos*, 266 Conn. 364, 832 A.2d 14, 41 (2003)); *see also Klingbeil*, ¶ 54, 492 P.3d at 290–91 (Kautz, J., specially concurring) (quoting *McGinn v. State*, 2015 WY 140, ¶ 51, 361 P.3d 295, 306–07 (Wyo. 2015) (Fox, J., concurring)). "Jurors recognize the prosecutor's role as a leader of law enforcement in their community; they naturally regard the prosecutor as a symbol of authority; that recognition and regard may impress a jury, causing jurors to give significant weight to the words of a prosecutor." *Talley*, ¶ 21, 153 P.3d at 263 (citing *Earll v. State*, 2001 WY 66, ¶ 12, 29 P.3d 787, 791 (Wyo. 2001)). Further, "it is improper for a prosecutor to 'express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant.'" *Buszkiewic v. State*, 2018 WY 100, ¶ 19, 424 P.3d 1272, 1278 (Wyo. 2018) (quoting *Carrier v. State*, 2017 WY 88, ¶ 60, 400 P.3d 358, 370 (Wyo. 2017)). "[I]n evaluating whether a prosecutor actually expressed [the prosecutor's] personal beliefs or opinions to the jury, we have to consider the statements in context." *Id.* (citations omitted).

[¶39] Anderson selectively takes issue with at least twelve instances where the prosecutor asked leading questions during his direct examination of witnesses. We will address those that are most reflective of Mr. Anderson's arguments since many of the cited instances are cumulative of the same argument.

[¶40] During the State's direct examination of Undersheriff Patrick, the prosecutor asked the following:

> Q. What does Mr. Anderson later say, if anything, about the location of the gun prior to the shooting? The discussion of an old cabinet.
>
> . . . .
>
> Q. When I refer to the gun, do you agree with me that would be a single shot, little old .22 rifle; correct?
>
> A. That's correct.

The prosecutor also asked about the victim's positioning at the time of the shooting.

Q. Okay. How did Mr. Anderson describe the victim standing up? Did he use gestures?

A. He just stood up and kind of – yeah. Kind of gesture with his head, was – Yes. I don't know how you want me to describe it.

Q. Well, let me see if you agree with this explanation. My understanding is that the defendant told you that [the victim], during the shooting, right up until the exact moment of the shooting, apparently, was standing upright.

A. That's true. Yes.

Later the prosecutor asks about the investigation of the incident.

Q. Okay. Undersheriff, I would suggest to you that during his opening statement [defense counsel] also said that law enforcement – or police, I think as he referred to them, left and effectively called it an accident. Is that accurate?

A. I don't believe those words were used. We were investigating it.

Q. How did that investigation proceed then?

A. We continued. We investigated it as a – as we dug deeper into it, we investigated it as an aggravated battery.

Q. Why was that charge initially considered aggravated battery for charging purposes?

A. Because of the gun.

Q. And because the victim was still living?

A. Yes. Sorry.

[¶41] During the direct examination of Sheriff Kory Fleenor, the prosecutor asked him about a picture and the positioning of the victim after the shooting:

Q. She was leaning with her head pointed towards the counter towards the right side of that photo?

14

A. I think her head was fairly straight up against the counter there.

Q. All right. My point is her legs were pointing toward the left side of the photo more or less; correct? I'm not trying to pin you down, Sheriff. I just want the jury to understand roughly where the victim was situated.

A. From the picture her legs would have kind of pointed off towards the right from time to time and then off towards the left a little bit as well.

. . . .

Q. Is that broom bent or broken or –

A. I didn't check to see if it was bent, but it's not broken.

Q. Does it appear to be bent?

A. If my memory serves correctly, no.

Q. In fact, I would suggest in this photo it appears to be straight.

A. Yes, sir.

. . . .

Q. All right. And if you're standing with the fridge to your left, and you take a couple steps, and then you've got the big toolbox to your right and you look to your left, you're looking down this narrow hallway, correct?

A. Correct.

[¶42] Anderson also takes issue with several leading questions that the prosecutor asked Dr. Schilke during the direct examination:

Q. Okay. Would you agree with me, Doctor, that in a contact wound of this type, when you've got the muzzle pressed up against the skin such that the gas and soot and so forth is

15

injected into the wound out of the barrel of the gun – Am I right about that?

A. Yes.

Q. – that that is the opposite – or the cause of what is called a recoil in guns? Would you agree with that?

A. Well, the recoil is going to be sort of the bouncing back of the weapon.

Q. Correct. But would you agree with me that that bouncing back, what is commonly called the recoil is due to that sudden gas explosion and –

A. Oh, I see what you're saying. Yes.

Q. It's the opposite effect, the same thing, basically?

A. Yes.

Q. All right. My point being, would you agree with me that gun had to have been held with some pressure up to the skin –

This line of questioning ended with defense counsel's objection related to Dr. Schilke's testimony on the victim's manner of death as discussed above. Anderson also challenges the prosecutor's alleged improper use of leading questions for Deputy Ochoa and the State's firearms expert, Kathryn Bacon.[7]

[¶43]  As it is made apparent from the above-quoted portions of the trial transcript, many of the leading questions that Anderson takes issue with on appeal involved minor, inconsequential, or cumulative facts.  Further, the leading questions that involved, arguably, more important facts did not clearly violate W.R.E. 611(c).  Based on this Court's review of the record, the prosecutor's leading questions also did not clearly contain any statements of the prosecutor's personal beliefs.

---

[7] In one instance, the prosecutor asked Deputy Ochoa if he was "aware of why the wound is wider than the width of a .22 caliber bullet?"  Deputy Ochoa responded: "[y]es. The pathologist, I believe, Dr. Schilke, advised me that –"  An objection was raised, and the district court sustained the objection on the basis of hearsay.  No other remedial action was requested.  Anderson argues the fact regarding the width of the wound was not in evidence prior to this question and thus the question was improper.  Defense counsel's objection was related to Deputy Ochoa's answer rather than the prosecutor's question itself.  This leading question therefore remains part of this Court's review for plain error.

[¶44]  It was also not clear if the prosecutor's leading questions referred to facts not in evidence.  As was pointed out in the State's brief, the facts the prosecutor asked about through the leading questions were all admitted into evidence and were often facts testified to prior to the questions being asked.  For example, the prosecutor mentioned a "little old .22 rifle" when questioning Undersheriff Patrick.  Multiple witnesses testified to the .22 rifle, including Anderson.  Further, Undersheriff Patrick had testified to the victim's positioning before the shooting prior to the prosecutor's question that Anderson challenges on appeal.  The leading questions asked of Sheriff Fleenor involved describing a picture of the scene of the incident, which had been admitted into evidence prior to his testimony.  Lastly, the leading questions the prosecutor asked of Dr. Schilke were objected to on other grounds, as discussed above.

[¶45]  As several courts have made clear, and as Anderson acknowledges in his brief, it is very rare to reverse a case for improper leading questions.  *See United States v. Coleman*, 914 F.3d 508, 512 (7th Cir. 2019) ("[E]ven when they are improper, leading questions rarely give rise to plain error." (citing *United States v. Durham*, 645 F.3d 883, 891 (7th Cir. 2011))); *United States v. Meza-Urtado*, 351 F.3d 301, 303 (7th Cir. 2003) ("[W]e think error, plain or otherwise, could never be identified in a case where only the form of a question to which no objection is made is challenged on appeal."); *United States v. Tyler*, 42 Fed. Appx. 186, 191 (10th Cir. 2002) (unpublished) ("Appellate courts have shown 'an almost total unwillingness to reverse for infractions' of the rule against leading questions." (quoting *DeFiore*, 720 F.2d at 764)).  The reason for this "is because 'in the face of a sustained objection, most lawyers can rephrase a leading question to elicit the desired testimony.'  That is especially likely when the leading question elicits the same response that a witness would have given if asked a neutral question." *Coleman*, 914 F.3d at 512 (quoting *Durham*, 645 F.3d at 891 and citing *United States v. Miller*, 782 F.3d 793, 799–800 (7th Cir. 2015)); *see also Meza-Urtado*, 351 F.3d at 303 ("[A]n objection to a question as 'leading' is only an objection to the 'form' of the question.  If an objection is offered and sustained, the examiner simply rephrases the question and draws the desired information from the witness.").

[¶46]  Based on the Court's review of the record, the Court does not find any clearly improper leading questions involving the prosecutor's personal beliefs or reference to facts not in evidence.  Anderson has failed to demonstrate a violation of a clear and unequivocal rule of law, and we need not proceed to the third prong of plain error.

### *CONCLUSION*

[¶47]  The district court did not abuse its discretion in admitting the October 26, 2019, text message and by permitting the forensic pathologist to testify the victim's manner of death was homicide.  The prosecutor did not commit plain error or prosecutorial misconduct by asking witnesses leading questions during his direct examinations.  We affirm.