# THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 101

OCTOBER TERM, A.D. 2023

October 24, 2023

NORTHERN ARAPAHO TRIBE, a
federally-recognized Indian Tribe and THE
WIND RIVER HOTEL & CASINO, an
enterprise wholly owned by an arm of the
Northern Arapaho Tribe,

Appellants
(Plaintiffs),

v.

BALDWIN, CROCKER & RUDD, P.C. and
KELLY RUDD,

Appellees
(Defendants).

S-22-0265

*Appeal from the District Court of Fremont County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
> Lucas Buckley and JoAnna S. DeWald* of Hathaway & Kunz, LLP, Cheyenne,
> Wyoming; and Adam G. Unikowsky of Jenner & Block, LLP, Washington, DC.
> Argument by Mr. Unikowsky.

*Representing Appellee:*
> Scott E. Ortiz and Zara S. Mason of Williams, Porter, Day, Neville, PC, Casper,
> Wyoming. Argument by Mr. Ortiz and Ms. Mason.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

*\* An Order Allowing Withdrawal of Counsel was entered on August 7, 2023.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]    The Northern Arapaho Tribe and the Wind River Hotel & Casino (collectively the Tribe) filed suit against their former attorneys, Baldwin, Crocker & Rudd, P.C., and Kelly Rudd (collectively BCR), seeking injunctions for the return of tribal funds and documents, an accounting, and damages for conversion and civil theft.  The district court granted partial summary judgment in favor of BCR on the claims for an accounting and injunctions.  The conversion and civil theft claim proceeded to a jury trial where the jury found in favor of BCR.  The Tribe appeals claiming the district court erred when it imposed sanctions on the Tribe under Rule 11 of the Wyoming Rules of Civil Procedure (W.R.C.P.) and when it granted summary judgment in favor of BCR on the accounting claim.  The Tribe also asserts the district court's admission of irrelevant racially charged evidence resulted in prejudice that warrants reversal of the jury's verdict.  We reverse in part and affirm in part.

## ISSUES

[¶2]    The Tribe raises three issues, which we rephrase as follows:

> I.    Did the district court err when it granted BCR's motion for sanctions under W.R.C.P. 11?
>
> II.   Did the district court err when it granted BCR's motion for summary judgment on the Tribe's accounting claim?
>
> III.  Does the district court's admission of irrelevant racially charged evidence warrant reversal?

## FACTS

**Tribal Government and History with BCR**

[¶3]    The Tribe is a federally recognized Indian Tribe located on the Wind River Reservation.  The Wind River Hotel & Casino is an economic arm of the Tribe, and it is wholly owned by the Tribe.  The Tribe has approximately 10,650 enrolled members.  The Tribe has two main governing bodies: the Northern Arapaho Business Council (NABC) and the Northern Arapaho General Council (General Council).  The NABC is the executive branch of the Tribe, and it handles the Tribe's day-to-day affairs.  The NABC is made up of six members, who are elected every two years.  The Tribe does not have a constitution, and the NABC acts through passing binding resolutions.  The NABC attempts to act by consensus, but a majority vote of four members constitutes a controlling decision.  The NABC answers to the General Council.  The General Council is the "supreme governing body" of the Tribe, and it is made up of all the adult members of the Tribe, who may convene a quorum of 150 members to consider and pass General Council resolutions.

1

[¶4]    BCR and its partners, Andrew Baldwin, Berthenia Crocker, and Kelly Rudd, acted as counsel for the Tribe in various capacities from 1988–2019.  The Tribe asked BCR to perform a wide variety of work.  BCR became involved in housing matters, gaming issues, water projects, revision or creation of tribal law, custody cases, an eagle permit case, and many other legal matters.  The Tribe has 60–70 different programs that provide services to tribal members.  With the permission of the NABC, many of these program directors reached out to BCR for legal assistance.  Eventually, ninety percent (90%) of BCR's practice consisted of work for the Tribe.

[¶5]    BCR achieved many successes on behalf of the Tribe.  BCR helped the Tribe achieve its dream of making the Wind River Casino a Class III casino, which generates millions of dollars in revenue every year for the Tribe.  BCR also achieved a $6.75 million settlement with Marathon Oil and a $1.2 million settlement with Verizon on behalf of the Tribe.

**The Change in Billing Format**

[¶6]    Over the course of their approximately 30-year relationship, BCR billed the Tribe for millions of dollars in fees, including more than $8 million in fees and expenses between 2012 and 2019.  For many years, BCR sent detailed bills to the Tribe's finance office.  These bills contained confidential information including the names of some families who were receiving legal services.  The NABC became concerned when some of this information leaked out into the public domain through employees in the finance office.  At the request of the NABC, BCR stopped providing detailed bills and started giving the NABC a simplified "Monthly Billing Summary."  These summaries showed lump sums for fees incurred in general categories of cases.  However, they did not show how many hours were being billed per legal matter, what work was being performed, which attorney had performed that work, or the hourly rates charged for that work.  One of the BCR partners would present the Monthly Billing Summaries to the NABC for approval.  BCR informed the NABC the detailed billing statements were available for them to examine at BCR's offices at any time, and on the few occasions when a member of the NABC requested detailed billing statements, BCR provided them via email.  Some members of the NABC also occasionally traveled to BCR's offices to review the detailed bills.

[¶7]    For most of the parties' relationship, the Tribe paid BCR's fees from the Tribe's general fund.  However, due to a downturn in the energy market, beginning in 2017, the NABC made the decision to pay those funds directly from BCR's trust account which held the proceeds received from a lawsuit related to the restoration of the Wind River.

**Breakdown of BCR's Relationship with the Tribe**

2

[¶8]     Although BCR acted as lead counsel for the Tribe, the Tribe occasionally hired outside counsel to handle certain matters.  Sometime around 2002, the Tribe asked BCR to help it create a policy that would ensure there was some coordination between all the outside attorneys who were working on special projects for the Tribe.  The Tribe wanted to ensure these attorneys were not taking inconsistent positions before any court or agency.  BCR helped the Tribe prepare a policy called the Legal Affairs of the Northern Arapaho Tribe Policies and Procedures (2002 Legal Affairs Policy).  This policy required BCR to complete conflicts of interest checks for any outside counsel.  The 2002 Legal Affairs Policy considered it a potential conflict of interest for outside counsel to represent clients with interests or positions adverse to the interests of the Tribe.  Under this policy, BCR made recommendations to the NABC about whether or not to hire a firm, but the ultimate decision was always left to the NABC.

[¶9]     In the fall of 2018, Roy Brown,[1] Chairman of the NABC at that time, decided he wanted to hire a different lobbyist for the Tribe in Washington, D.C.  He reached out to his law school friend, Craig Williams, who worked as a lobbyist with the law firm Kilpatrick, Townsend and Stockton, LLP (KTS).  At that time, Chairman Brown only intended for KTS to do some lobbying for the Tribe.  He did not intend for KTS to replace BCR as lead counsel for the Tribe.  Chairman Brown was not reelected to the NABC in November 2018.

[¶10]   In February 2019, with the approval of the NABC, Councilman Spoonhunter,[2] who was Chairman of the NABC at that time, reached out to Mr. Williams and asked if KTS could perform an evaluation of the Casino's CEO, Jim Conrad, whose contract was going to expire in June.  Councilman Spoonhunter only intended for KTS to perform the evaluation, and he did not intend for KTS to replace BCR at this time.  The NABC passed a resolution authorizing KTS to complete an evaluation of Mr. Conrad.

[¶11]   Toward the end of April 2019, Keith Harper of KTS contacted BCR to schedule an interview about Mr. Conrad's performance and to obtain documents.  Through this communication, BCR informed Mr. Harper that KTS needed to comply with the conflicts of interest provision of the 2002 Legal Affairs Policy.  Mr. Harper informed BCR that KTS had performed its own conflicts check before accepting the representation; he otherwise declined to cooperate with BCR.[3]  BCR found Mr. Harper's response odd.  It was not the type of response BCR typically received when vetting outside counsel, so the firm began looking into KTS's potential conflicts.  BCR learned KTS was associated with a named defendant in an opioid case the Tribe had filed.  BCR also learned a KTS attorney, Larry

---

[1] Chairman Brown was chairman of the General Council at the time of the trial, so we will refer to him as Chairman Brown throughout this opinion.
[2] Councilman Spoonhunter was Co-Chairman of the NABC from 2016–2018, Chairman from 2018–2020, and a Councilman at the time of trial.  We will refer to him as Councilman Spoonhunter throughout this opinion.
[3] Unbeknownst to BCR, the engagement letter the NABC signed with KTS contained an express waiver of all conflicts of interests.

Roberts, who was then the Principal Assistant Secretary for Indian Affairs, had signed an executive order that adversely impacted the Tribe's tribal court. Both of these matters would have been considered potential conflicts under the 2002 Legal Affairs Policy.

[¶12] In early May, two partners with BCR met with some of the NABC members to discuss the conflicts issues. Councilman Spoonhunter was traveling at that time, so the BCR partners went to NABC chambers and discussed the issue with the three NABC members who were present. They advised BCR to reach out to Councilman Spoonhunter. After speaking with BCR, Councilman Spoonhunter believed it was the consensus of the other NABC members that KTS had a conflict of interest. However, Councilman Spoonhunter talked to the other Council members when he returned, and the majority of the NABC decided they wanted KTS to proceed with the evaluation. Councilman Addison disagreed. He wanted BCR to enforce the conflicts policy. Ultimately, KTS completed the evaluation with limited cooperation from Mr. Conrad and BCR.

[¶13] The NABC was surprised by the "pushback" it received on having KTS perform Mr. Conrad's evaluation. Several members of the NABC felt BCR was siding with Mr. Conrad instead of carrying out the wishes or express instructions of the Council, and they started to question whether BCR was acting in the best interests of the Tribe. In response, the majority of the NABC voted to repeal the 2002 Legal Affairs Policy on May 20, 2019. That same day, the majority of the NABC sent BCR a letter terminating the firm from representing the Tribe on any gaming matters.

[¶14] In early June, a majority of the NABC voted to terminate BCR's contract, and they passed a resolution ordering BCR to return all tribal funds and documents. On June 7, 2019, the Tribe authorized David Clark, an independent contractor providing financial services to the Tribe, to provide BCR with a bank account number to facilitate the transfer of the tribal funds that were being held in BCR's trust account. Over the course of the next five days, BCR transferred the following amounts to the Tribe from its trust account: 1) a payment of $879,719.48 into the Tribe's severance tax account; 2) a payment of $49,375.85 into the Casino's account; and 3) a payment of $165.71 for accrued interest into the Tribe's severance tax account.

[¶15] Mr. Clark proposed to the NABC that he would obtain the bank statements from BCR's trust account from January 1, 2019, to the dates of the transfers and verify all the activity in the account between those dates.[4] The NABC approved this proposal. On June 18, 2019, Mr. Clark went to BCR's office, reviewed the trust account bank statements, transactions slips, and supporting documents (from January 1, 2019, to June 2019) and

---

[4] Mr. Clark chose these dates because for several years prior, the trust account had been audited by the Tribe's external auditor, Charles Donham, and Mr. Clark did not see a need to go back and recreate those records because they had been presented in an audit and accepted by the NABC.

4

confirmed all the funds in the trust account were returned to the Tribe. He communicated this finding to BCR, the NABC, and the Tribe's finance office.

[¶16] The Tribe filed this suit on July 29, 2019, seeking the return of tribal funds and documents. On July 30, 2019, the Tribe posted the agenda for the August 10, 2019, General Council meeting, which included resolutions to ban either BCR or KTS from representing the Tribe. Five days before the scheduled vote, a public meeting was held where people accused BCR of stealing money from the Tribe. At least some of these allegations were made by KTS lawyer, Keith Harper. This meeting was publicly broadcasted on YouTube. At the General Council meeting five days later, a majority of the General Council voted in favor of banning BCR from working for the Tribe in perpetuity. After the General Council vote, BCR returned numerous boxes of paper files and a portable hard drive containing tribal documents to the Tribe.

**The Trial**

[¶17] Most of the Tribe's claims were resolved through summary judgment, and the only claim remaining to be tried was the conversion and civil theft claim. The Tribe's theory was that BCR took advantage of the Tribe's trust, failed to meet its ethical duties to communicate and justify its fees, and misappropriated $5.5 million in fees. The Tribe's evidence consisted of the testimony from three current and former NABC members who each swore they reviewed the billing summaries and still had lingering questions about what work BCR had actually performed due to the broad and general nature of the billing entries. The bulk of the Tribe's case rested on the testimony of its expert, Daniel Costello, who opined the quality of BCR's bills did not meet the required standard of care. Mr. Costello's largest complaint was that BCR's bills contained vast amounts of "block billing."[5] Mr. Costello did not opine about whether or not BCR's partners and associates actually worked the hours reflected in the bills. When asked to do so, he stated it would be impossible to determine whether the work had been performed due to the format of the bills.

[¶18] BCR presented a twofold defense. First, it argued KTS used improper methods, including making false and defamatory statements about BCR, to accomplish its goal of acquiring the Tribe's legal work. BCR put on evidence showing KTS decided it was adverse to BCR before the Tribe officially retained KTS to evaluate Mr. Conrad, and KTS used techniques to win over the Tribe that Councilman Spoonhunter admitted were improper, such as playing up its political connections and manipulating tribal leaders to make them feel important. BCR also offered evidence showing that after KTS started

---

[5] According to Mr. Costello, block billing occurs when multiple distinct actions are described in a single entry on a bill, and he opined lawyers should create separate, distinct billable entries for each completed task.

publicly alleging BCR misappropriated tribal funds, even tribal members who had good working relationships with BCR became skeptical and distrustful of BCR.

[¶19] Second, BCR presented evidence that although the billing summaries may not have contained detailed information about the work it performed on the Tribe's behalf, it kept the Tribe informed about that work in other ways, and BCR always answered any questions NABC members had about that work. BCR also presented evidence showing the NABC never asked BCR to change the format of its bills, resume sending detailed bills, or provide any additional details about the work it performed on behalf of the Tribe. Each BCR partner testified he or she worked every hour they billed, and they even rounded down the number of hours they billed. BCR called its own expert, Kim Cannon, who opined block billing did not violate any standard of care, and there was no evidence BCR overbilled the Tribe or that the BCR attorneys did not work every hour they billed.

[¶20] After five days of testimony, the jury ultimately determined BCR did not convert any tribal funds, and it returned a verdict in favor of BCR. This appeal timely followed.

## DISCUSSION

### I. *Did the district court err when it granted BCR's motion for sanctions under W.R.C.P 11?*

[¶21] On appeal, the Tribe argues the district court erred by awarding sanctions under W.R.C.P. 11 because BCR failed to strictly comply with the procedural requirements. The Tribe also contends BCR's failure to comply with these procedural requirements prejudiced the Tribe by precluding it from taking remedial measures that could have made the motion for sanctions moot. We agree.

[¶22] On September 11, 2019, BCR sent the Tribe a letter, captioned as a "Rule 11 Notice," claiming the allegations in ¶ 2 of the complaint, which accused BCR of "repeatedly and steadfastly" refusing to return tribal funds, were false and needed to be withdrawn within 21 days. BCR attached documents to the letter showing all the funds in the firm's trust account were transferred to the Tribe in June 2019. The Tribe sent BCR a letter responding to the Rule 11 notice, explaining why it thought the notice was improper under W.R.C.P. 11 and detailing the factual underpinnings of the allegations in ¶ 2.

[¶23] BCR filed a motion for Rule 11 sanctions with the district court on October 24, 2019. The certificate of service shows this motion was served on the Tribe on October 22, 2019, only two days before the motion was filed with the district court. Like the Rule 11 Notice, the motion complained about the allegations in ¶ 2 of the complaint. The Tribe opposed the motion, arguing BCR failed to identify a specific violation of Rule 11(b) and explaining why the allegations in ¶ 2 had evidentiary support.

6

[¶24]  The district court held a hearing on the Rule 11 motion on March 5, 2020.  Instead of discussing the allegations in ¶ 2, for the first time BCR asserted the allegations in ¶ 52, which alleged BCR was "in possession of" over $1,000,000 in tribal funds, were sanctionable.  After taking the matter under advisement, the district court ultimately entered an order granting BCR's Rule 11 motion.  The district court found:

> The *Complaint* states in ¶ 52 that "Defendants are in possession of, upon information and belief, over $1,000,000 in Tribal funds."  This is stated in the section of the *Complaint* regarding Count III – accounting.  It is clear on the record to date that the factual underpinnings of that claim could not have been accurate on the date it was plead and Rule 11's requirement of a factual basis was violated.  This issue is a narrow one, whether at the time of pleading Defendants' [sic] were or are currently in possession of over $1,000,000 of Tribal funds.  When Defendants' [sic] filed their *Motion for Sanctions* they asserted in good faith that it was not true, and that a representative of the Tribe's finance office had inspected the trust ledgers and confirmed that all the Tribal funds that were in the trust had been returned to the Tribe, and that this was done before the *Complaint* was filed.  That is the state of the evidence before the [c]ourt on the issue, and While [sic] Plaintiff [sic] may believe that there was some foul play by the Defendants over past accounting and overbilling, (which seems to be the implication of this claim), it was not proper to plead an inflammatory allegation of misuse or withholding of $1,000,000 in Tribal funds without evidentiary support.  This is particularly true where the evidence was easily at hand at the time the Complaint was filed and under any characterization now argued, this could not have been true.

[¶25]  The district court's order required the Tribe to "present a motion and order striking the allegation in question" and to pay BCR's fees relating to that motion.  Although BCR filed an application seeking $15,435 in attorney's fees, the district court did not enter an order awarding any of those fees.[6]

---

[6] BCR argues we should not consider this issue because the Rule 11 order is either moot or is not a final appealable order because it does not affect the Tribe's substantial rights.  The Rule 11 order is not moot, because although the district court has not yet fixed the amount of fees the Tribe is required to pay, it did order the Tribe to pay BCR's fees incurred in bringing the Rule 11 motion.  In addition, BCR's argument that the Rule 11 order does not affect the Tribe's substantial rights is somewhat disingenuous, given that it repeatedly argued below the order determined certain issues on the merits, including the conversion claim,

[¶26] Rule 11 requires all factual contentions in a complaint to have evidentiary support. W.R.C.P. 11(b)(3). If the opposing party believes a factual contention lacks evidentiary support, Rule 11(c) sets forth a particular process to follow when filing a motion for sanctions:

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

W.R.C.P. 11(c). "Rule 11 sanctions are not to be cavalierly threatened or imposed." *Edsall v. Moore*, 2016 WY 71, ¶ 13, 375 P.3d 799, 803 (Wyo. 2016) (quoting *Welch v. Hat Six Homes*, 2002 WY 81, ¶ 19, 47 P.3d 199, 205 (Wyo. 2002)). We have recognized Rule 11 contains a "safe harbor" provision where counsel provides a warning to opposing counsel by serving the motion for sanctions on "opposing counsel only." *Edsall*, ¶ 13, 375 P.3d at 803 (quoting *Welch*, ¶ 19, 47 P.3d at 205). Counsel cannot file the motion with the court until at least 21 days after serving the motion only on opposing counsel, "in order to give opposing counsel an opportunity to correct or withdraw any allegedly sanctionable paper." *Id.* (quoting *Welch*, ¶ 19, 47 P.3d at 205) (internal citations omitted). We will reverse a district court's granting of sanctions where the applicant's papers do not meet the strict procedural requirements of Rule 11. *See Edsall*, ¶ 13, 375 P.3d at 803 (finding the district court did not have jurisdiction to consider a Rule 11 motion for attorney's fees because the motion was filed after the case had been dismissed and therefore could not have complied with the requirements of Rule 11); *Welch*, ¶ 19, 47 P.3d at 205, *overruled on other grounds by Matter of Mears*, 2018 WY 109, 426 P.3d 824 (Wyo. 2018) (vacating an award of sanctions when the Rule 11 motion was filed after the case was settled); *Caldwell v. Cummings*, 2001 WY 106, ¶¶ 10–12, 33 P.3d 1138, 1141–42 (Wyo. 2001), *overruled on other grounds by Matter of Mears*, 2018 WY 109, 426 P.3d 824 (Wyo. 2018) (reversing an award of sanctions when the Rule 11 motion was contained in a motion for judgment on the pleadings and was not set forth in a separate motion as procedurally required under the rule).

---

and it argued the order had some relevance as to certain witnesses' credibility such that it should be able to tell the jury about the order. We have recognized that "[g]enerally, interlocutory orders merge into the final order." *Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 11, 180 P.3d 895, 899 (Wyo. 2008) (citing *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 820 (Wyo. 1994)). The Rule 11 order merged into the final appealable order in this case and is reviewable.

[¶27] In this case, BCR failed to comply with Rule 11's procedural requirements in three ways. First, BCR's "Rule 11 Notice" was not a proper substitute for serving a motion under Rule 11. *See Caldwell*, ¶ 12, 33 P.3d at 1142 (holding a letter sent to counsel is not a proper substitute for serving a motion for sanctions under Rule 11); *Rusk v. Fid. Brokerage Servs.*, 850 F. App'x 657, 659 (10th Cir. 2021) ("our precedent requires service of the actual motion to be filed; warning letters are insufficient."). Second, BCR served its motion on the Tribe only two days before filing it with the district court, far short of the required minimum 21 days. W.R.C.P. 11(c)(2). Finally, at the hearing, BCR complained about different allegations than those it claimed were sanctionable in its "Rule 11 Notice" and motion. Thus, BCR did not give the Tribe a warning or opportunity to withdraw the allegedly sanctionable allegation prior to filing its motion. *See* W.R.C.P. 11(c); *Edsall*, ¶ 13, 375 P.3d at 803 (quoting *Welch*, ¶ 19, 47 P.3d at 205) (internal citations omitted).

[¶28] The district court should not have imposed sanctions because BCR failed to comply with the procedural requirements of Rule 11. The district court's order granting BCR's Rule 11 motion and its award of sanctions must be reversed. *See Edsall*, ¶ 13, 375 P.3d at 803; *Welch*, ¶ 19, 47 P.3d at 205; *Caldwell*, 2001 WY 106, ¶¶ 10–12, 33 P.3d at 1141–42.

## II. Did the district court err when it granted BCR's motion for summary judgment on the Tribe's accounting claim?

[¶29] We review a district court's order granting summary judgment de novo. *Matter of Phyllis V. McDill Revocable Trust*, 2022 WY 40, ¶ 16, 506 P.3d 753, 759 (Wyo. 2022) (citing *Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 10, 403 P.3d 1033, 1040 (Wyo. 2017)).

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*Id.*, 506 P.3d at 759–60 (citing *Bear Peak Res., LLC*, ¶ 10, 403 P.3d at 1040) (internal citations and quotation marks omitted). We may affirm an order granting summary judgment on any basis appearing in the record. *Cardenas v. Swanson*, 2023 WY 67, ¶ 10, 531 P.3d 917, 919 (Wyo. 2023).

[¶30] The complaint alleged the Tribe was entitled to an equitable accounting under Rule 1.15(e) of the Wyoming Rules of Professional Conduct (W.R.P.C.) and pursuant to the

Uniform Trust Code, Wyoming Statutes §§ 4-10-101 et seq. (LexisNexis 2021).

[¶31] BCR moved for summary judgment on this accounting claim, asserting Wyoming does not recognize an independent cause of action for an accounting, and the Tribe could not bring an equitable claim for an accounting unless it showed it did not have an adequate remedy at law. BCR asserted the Tribe could not make this showing because it was in possession of trust account bank statements and transaction information. In the alternative, BCR argued the accounting had already been completed when Mr. Clark reviewed the trust account documents in June 2019.

[¶32] In response, citing to the Restatement (Second) of Trusts § 172, the Tribe argued that as a trustee, BCR had the burden of proving the validity and propriety of any expenditure of trust funds, and it was liable for any funds for which it could not account. The Tribe also asserted Mr. Clark had not performed an accounting and had merely verified the bank balance held by BCR in June 2019 was returned to the Tribe.

[¶33] The district court granted BCR's motion for summary judgment on the accounting claim. It found the Tribe was entitled to an accounting under W.R.P.C. 1.15(e) after it had terminated BCR's representation, but it had received that accounting when Mr. Clark reconciled the trust account statements in June 2019. The district court also found the Tribe's expert used the documents provided by BCR to prepare his report as to what sums BCR had allegedly converted, and the Tribe failed to provide any factual basis showing how BCR did not comply with its ethical obligations under W.R.P.C. 1.15(e). The district court also found an equitable remedy for an accounting was not cognizable where an adequate remedy at law exists, and the Tribe's conversion claim was an adequate remedy.

## A. Accounting Under W.R.P.C. 1.15(e)

[¶34] The Tribe asserts the district court's conclusion the Tribe failed to explain what additional information BCR was required to provide under this rule was incorrect because the Tribe pinpointed the precise invoices that were inadequate "and made clear that if [BCR] could not further explain those invoices, [BCR was] obligated to reimburse the trust account." The Tribe contends W.R.P.C. 1.15(e) requires BCR to provide an accounting for all deductions from the Tribe's trust account, and BCR did not meet this obligation because the Tribe's expert identified $5.5 million of withdrawals that were "inadequately documented." BCR argues summary judgment was appropriate because it complied with the requirements of W.R.P.C. 1.15(e).

[¶35] We have yet to address what a "full accounting" looks like under W.R.P.C. 1.15(e). However, we have held "[a] violation of the rules of professional conduct does not, on its own, give rise to a cause of action against a lawyer." *Gowdy v. Cook*, 2020 WY 3, ¶ 46, 455 P.3d 1201, 1212 (Wyo. 2020) (citing Wyoming Rules of Professional Conduct, Scope, Comment 20; *Bevan v. Fix*, 2002 WY 43, ¶ 62, 42 P.3d 1013, 1032 (Wyo. 2002)). If the

Tribe had filed a legal malpractice action, W.P.R.C. 1.15(e) might have been relevant to establish the proper standard of care. However, this Rule does not give rise to an independent cause of action for an accounting. BCR was entitled to summary judgment as a matter of law on this claim.

## B. Equitable Accounting and Adequate Remedy

[¶36] Citing to our decision in *Bear Peak Resources, LLC v. Peak Powder River Resources, LLC*, 2017 WY 124, ¶ 76, 403 P.3d at 1056 (citing *Haynes Trane Service Agency, Inc. v. American Standard, Inc.*, 51 Fed. Appx. 786, 800 (10th Cir. 2002)), the district court recognized a claim for an equitable accounting was not cognizable where an adequate remedy at law exists. The district court found BCR had produced thousands of pages of documents and there was no reason to require BCR to "distill [its] billing practices to a more digestible state[,]" and it found the Tribe's expert had been able to use the information provided by BCR to draft his report. The district court ruled the Tribe could attempt to prove at trial that BCR's dishonesty and misconduct resulted in conversion, and if it succeeded, that remedy adequately foreclosed any equitable relief.

[¶37] The Tribe asserts the district court incorrectly concluded the conversion and civil theft claim was an adequate remedy. The Tribe notes that its claim is "founded on [BCR's] trust obligations." The Tribe argues a "civil conversion remedy is inadequate because it flips the burden of proof and relieves the trustee of the burden of justifying its withdrawals." The Tribe asserts BCR did not satisfy its obligation to provide an accounting because its expert identified $5.5 million of withdrawals from the trust account that were "inadequately documented." The Tribe argues "[b]ecause [BCR] could not meet [its] burden to justify [its] withdrawals from the trust account, [it is] legally required to replenish it by the amount of the unexplained withdrawals, with all doubts resolved against [BCR]." BCR contends the Tribe had to show a complete absence of an adequate remedy at law, and the Tribe's conversion claim was an adequate remedy.

[¶38] Whether a remedy at law is adequate depends on the circumstances of each case. *See Watson v. Sutherland*, 72 U.S. 74, 78, 18 L. Ed. 580 (1866). An adequate remedy at law "must be plain and adequate, or in other words, as practical and efficient to the ends of justice, and its prompt administration, as the remedy in equity." *Id.* (quoting *Boyce's Exrs. v. Grundy*, 28 U.S. 210, 214, 7 L. Ed. 655 (1830)); *see also* Remedy, *Black's Law Dictionary* (11th ed. 2019) (defining an adequate remedy as a legal remedy, such as an award of damages, "that provides sufficient relief to the petitioning party . . . .").

> [A] suit in equity to enforce a legal right can be brought only when the court can give more complete and effectual relief, in kind or in degree, on the equity side, than on the common-law side; as for instance, by compelling a specific performance, or the removal of a cloud on the title to real estate; or preventing

11

> an injury for which damages are not recoverable at law . . . or where an agreement procured by fraud is of a continuing nature, and its rescission will prevent a multiplicity of suits. . . .

*Buzard v. Houston*, 119 U.S. 347, 352, 7 S. Ct. 249, 252, 30 L. Ed. 451 (1886) (internal citations omitted). On the other hand, where the suit is for the judicial determination of an amount of monetary damages and the enforcement of its payment by the court, "the proceeding is essentially an action at law . . . ." *Jones v. Mut. Fid. Co.*, 123 F. 506, 521 (C.C.D. Del. 1903). We have repeatedly refused to grant equitable relief where monetary damages would provide sufficient relief to the injured party. *See, e.g., Bear Peak Res., LLC.*, 2017 WY 124, ¶ 76, 403 P.3d at 1056 (holding a party could not bring an equitable accounting claim where breach of contract damages were sufficient); *McNeill Fam. Tr. v. Centura Bank*, 2003 WY 2, ¶ 17, 60 P.3d 1277, 1285 (Wyo. 2003) (denying equitable relief from a foreclosure action when plaintiffs could have purchased the certificate of purchase or the right of redemption); *BHP Petroleum Co., Inc. v. Okie*, 836 P.2d 873, 876–77 (Wyo. 1992) (reversing a grant of partial recission where breach of contract damages were available); *Farmers' State Bank of Riverton v. N. Tr. Co.*, 270 P. 163, 166 (Wyo. 1928) (holding rescission was not available for a breach of contract). The legal nature of a remedy is not lost simply because the particular circumstances of a case may make it difficult to achieve that remedy. *Jones,* 123 F. at 521. The lack of an adequate remedy and the inability to obtain "the fruits of a remedy are quite distinct." *Id.*

[¶39] As the party seeking the benefit of equitable relief, the Tribe has the burden of showing its conversion and civil theft claim is not an adequate remedy at law. *Spence v. Sloan*, 2022 WY 96, ¶ 63, 515 P.3d 572, 588 (Wyo. 2022) (citing *McNeill Fam. Tr.*, 2003 WY 2, ¶ 17, 60 P.3d at 1285). The Tribe argues its conversion and civil theft claim is not an adequate remedy because it places the burden of proof on the Tribe instead of BCR. The Tribe contends as a "trustee," BCR should be required to justify every penny it removed from the trust account rather than the Tribe having to prove BCR converted or stole the funds. The Tribe's argument is misplaced.

[¶40] An accounting is "[a] rendition of an account[.]" *Accounting*, Black's Law Dictionary (11th ed. 2019). As the Tribe points out in its briefing, an accounting explains withdrawals from a trust account. In this case, the Tribe authorized each withdrawal from the trust account that it now challenges. Importantly, there is no question where the funds went, and the Tribe has made no claim that it did not know to whom the funds were paid. In other words, the Tribe already had an adequate accounting. What the Tribe truly asserted in its accounting claim was that BCR was wrongfully paid the funds because it did not perform the work to earn them. That went beyond a claim for an accounting and was in essence its conversion and civil theft claim. We affirm the district court's grant of summary judgment in favor of BCR on this claim.

12

### III. Does the district court's admission of irrelevant racially charged evidence warrant reversal?

[¶41] The Tribe argues the district court erred in admitting racially charged evidence because it was inadmissible under Rules 402 and 403 of the Wyoming Rules of Evidence (W.R.E.). The Tribe asserts:

> The trial in this case related to a systematic conversion of funds of the Tribe by [BCR] for years while [it] acted as counsel for the Tribe. Despite this clearly defined and limited scope, the district court allowed [BCR] to introduce irrelevant and prejudicial evidence at trial which had no bearing on the salient cause of action.

The Tribe asserts BCR attempted to use this allegedly irrelevant evidence to prejudice the jury against the Tribe by "presenting the dispute in starkly racial terms" and by presenting themselves as the "white lawyers" positioned against the "Native lawyers" of KTS and by extension the Tribe. The Tribe argues this "narrative was crafted to encourage the jury to sympathize with the white lawyers [(BCR)] and decide against the Tribe. The result was a racially motivated trial that prejudiced the Tribe."

[¶42] BCR contends: "The events leading up to BCR being terminated as legal counsel for the Tribe and the filing of this lawsuit against BCR are crucially important conte[x]t for the claims at issue." BCR contends it had successfully represented the Tribe since 1988, and its relationship with the Tribe only started to "unravel" once KTS started to inject "itself into all facets of the Tribe . . . ." BCR asserts the statements made by Mr. Harper at the meeting broadcast on YouTube influenced the General Council vote that resulted in BCR being banned from working for the Tribe. As such, BCR argues "motive and bias became the foundation of this lawsuit and were crucial topics for cross-examination of the Tribe's fact witnesses." Citing to our decisions in *Lawrence v. State*, 2007 WY 183, ¶ 17, 171 P.3d 517, 522–523 (Wyo. 2007), and *Hannon v. State*, 2004 WY 8, ¶ 22, 84 P.3d 320, 331–332 (Wyo. 2004), BCR further contends this evidence was relevant because the partiality of a witness is always relevant to discredit the witness, expose his motive for testifying, and shed light on issues that might affect the weight of his testimony.

[¶43] This issue requires us to review the district court's decision on the admission of evidence.

> We review a district court's ruling on the admissibility of evidence for an abuse of discretion. We afford considerable deference to a trial court's rulings on the admissibility of evidence, and we will not disturb the trial court's ruling if there is a legitimate basis for it. Determining whether the trial court

abused its discretion involves the consideration of whether the
court could reasonably conclude as it did, and whether it acted
in an arbitrary and capricious manner.

*Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 58, 479 P.3d 1222,
1239 (Wyo. 2021) (quoting *Matter of LDB*, 2019 WY 127, ¶ 43, 454 P.3d 908, 921 (Wyo.
2019) (internal citations and quotation marks omitted). Even if we determine certain
evidence was admitted in error, the Tribe is required to show prejudice. *Lyman v. Childs*,
2023 WY 16, ¶ 55, 524 P.3d 744, 760 (Wyo. 2023). "An error is deemed prejudicial if
there is a reasonable probability that, if the evidence had not been admitted, the outcome
would have been more favorable to the party opposing the evidence." *Id.* (citing *Spence v.
State*, 2019 WY 51, ¶ 11, 441 P.3d 271, 274 (Wyo. 2019); *Klingbeil v. State*, 2021 WY 89,
¶ 32, 492 P.3d 279, 286 (Wyo. 2021)).

### A. References to Race

[¶44]   The first reference to race occurred during BCR's opening statement when counsel
stated:

> The KTS lawyers from Washington, D.C., one of their big
> calling cards was, hey, we're Native American. We're from
> different tribes around the country, and you should only trust
> Native American lawyers. So there was a subtle hint that you
> can't trust BCR lawyers because they're not Native Americans,
> which is a tragedy given . . . what my clients did.

The Tribe did not object to this statement.

[¶45]   At a conference the following morning, the Tribe asked the district court to preclude
BCR from introducing any evidence pertaining to KTS. However, the Tribe did not
specifically address defense counsel's comments about race. BCR discussed race with
three witnesses. During cross examination of Councilman Spoonhunter and Chairman
Brown, BCR impeached both witnesses with portions of their depositions wherein they
admitted one of KTS's "calling cards" was that they were Native American lawyers who
would understand the Tribe's issues better than non-Native lawyers. In addition, Mr. Clark
testified he believed there was a behind the scenes effort to rid the tribe of non-Native
consultants. Due to this effort, he offered to terminate his contract and rid the Tribe of
"one more white guy." The email in which Mr. Clark made this offer was admitted into
evidence over the Tribe's objection based on relevance. The Tribe ultimately did not
terminate Mr. Clark's contract. Mr. Clark further testified he heard KTS was perpetuating
the idea that the Tribe should only trust Native lawyers.

[¶46]   The final reference to race occurred in BCR's closing argument where counsel

14

reminded the jury about Mr. Clark's concerns that KTS was disparaging BCR, had ulterior motives, and was "just getting rid of all the white guys[.]" Counsel went on to argue the trust BCR established over 30 years was quickly undone by KTS's disparaging and untrue allegations of theft and its claims tribal members could not trust white lawyers. The Tribe did not object to this argument. We analyze whether the Tribe was prejudiced by the admission of this evidence and argument.

## B. Prejudice

[¶47] We have expressed a "desire to remove illegitimate references to race from judicial proceedings to the fullest extent possible[,]" while recognizing there are some legitimate reasons to mention race. *Carter v, State*, 2010 WY 136, ¶¶ 6–10, 241 P.3d 476, 480–82 (Wyo. 2010). Evidence of a person's racial prejudice against a party, victim, or class of persons may be admissible when it reflects upon that person's bias or motive. *See Campbell v. State,* 999 P.2d 649, 663 (Wyo. 2000) (finding evidence of victim's mixed race was relevant to establish defendant's motive in a child abuse case). The evidence set forth above had no bearing on any of the witnesses' biases or motive to testify untruthfully. Unlike the evidence that NABC members were swayed by KTS inviting them to political events and making them feel important, or the evidence that members of the Tribe who had good relationships with BCR became skeptical about BCR after Mr. Harper's allegations at the August 2019 public meeting, there was no evidence members of the Tribe were improperly influenced by KTS's statements about race or that they adopted KTS's attitudes towards non-Native lawyers. On the contrary, Councilman Spoonhunter and Chairman Brown both testified they never had any concerns that the BCR partners were not Native American. When Mr. Clark offered to resign, Councilwoman Calling Thunder informed him it was not her choice to get rid "of another white guy," and the Tribe could not "move forward without [his] expertise."

[¶48] Because there was no proper purpose for the admission of this evidence and argument, we must decide if the Tribe met its burden of showing there is a reasonable probability the outcome of the trial would have been more favorable to the Tribe if the evidence and argument had not been admitted. *Lyman*, 2023 WY 16, ¶ 55, 524 P.3d at 760 (citing *Spence*, 2019 WY 51, ¶ 11, 441 P.3d at 274; *Klingbeil*, 2021 WY 89, ¶ 32, 492 P.3d at 286); *Singer v. Lajaunie*, 2014 WY 159, ¶ 41, 339 P.3d 277, 288 (Wyo. 2014) (citing *Proffit v. State*, 2008 WY 103, ¶ 12, 191 P.3d 974, 977 (Wyo. 2008)).[7]

[¶49] The Tribe argues it met this burden and claims:

---

[7] Because the Tribe did not object to the references to race in opening statements or closing arguments, we review for plain error. *Berry v. State*, 2023 WY 75, ¶ 37, 533 P.3d 474, 485 (Wyo. 2023) (citing *Anderson v. State*, 2022 WY 119, ¶ 35, 517 P.3d 583, 593 (Wyo. 2022). However, even under plain error review, the Tribe is required to show "it is reasonably probable [it] would have received a more favorable verdict if the error had not been made." *Id*. (quoting *Leners v. State*, 2021 WY 67, ¶ 24, 486 P.3d 1013, 1018 (Wyo. 2021)).

> While it is true that an isolated racial comment can be overlooked when the offending parties can otherwise point to overwhelming evidence on their side of the ledger, prejudice is not outweighed when, as here, there is a 'concerted effort . . . to create prejudice in the jurors' minds based upon something other than the evidence.

The Tribe contends BCR's evidence at trial was not overwhelming, and the Tribe presented "significant evidence" BCR engaged in billing practices that fell below industry standards and the rules of professional conduct. The Tribe contends BCR "fabricated an irrelevant conspiracy theory to deflect attention from [its] own behavior and focus on the racial divide among the parties. This orchestrated attempt to confuse the jury and encourage a decision on an improper basis requires reversal."

[¶50] BCR contends when "[l]ooking at the record as a whole, there is not a reasonable probability the verdict would have been in favor of the Tribe had the district court excluded the allegedly 'racially inflammatory evidence.'" The district court instructed the jury that to prove conversion, the Tribe had to prove BCR billed the Tribe and received payment for legal work that was not actually performed. BCR claims the Tribe did not meet this burden, and BCR put on evidence establishing its partners performed all of the work for which the firm billed the Tribe.

[¶51] We agree with BCR that the Tribe failed to meet its burden. Although certain NABC members expressed dissatisfaction with the format of BCR's bills, none of these witnesses offered any evidence BCR was paid for work it did not perform. While the Tribe's expert took issue with the format of BCR's bills, he refused to opine about whether the work had actually been performed. Councilman Spoonhunter testified the Tribe needed two full-time in-house lawyers and outside counsel who provided services of up to $50,000 a month to cover all of the work BCR had been performing.

[¶52] Every BCR partner testified they performed all of the work reflected in their bills. BCR presented evidence it regularly communicated with the NABC, frequently discussed ongoing legal matters and projects, and kept the NABC informed about what they were doing on behalf of the Tribe. BCR's expert testified the block billing format BCR used for its bills did not violate any ethical obligations, and he did not see any indications BCR engaged in overbilling. The Tribe failed to present any evidence BCR received payment for legal work it did not perform.

[¶53] We continue to recognize the core principle that illegitimate references to race should be removed from judicial proceedings to the fullest extent possible, and this was not one of those cases where there was a legitimate exception to that principle. *See Carter*, 2010 WY 136, ¶ 6, 241 P.3d at 480–81. Although there was no proper purpose for the

racially charged evidence and argument in this case, it was used to disparage KTS, not the Tribe. Other courts have found the interests of justice do not require reversal when race is not used to disparage a party, and that party otherwise received a fair trial. *See State v. Jackson*, 714 N.W.2d. 681, 695 (Minn. 2006); *State v. Clifton*, 701 N.W.2d 793, 800 (Minn. 2005). When considering the record as a whole, BCR did not introduce evidence of KTS's calling card in an attempt "to cause the jury to decide the case on the basis of passion or prejudice rather than reason . . . ." *Clifton*, 701 N.W.2d at 800. Given the evidence BCR presented at trial, which had nothing to do with KTS or the racially charged evidence, and that the Tribe failed to present evidence BCR received payment for work that was not performed, there is not a reasonable probability the outcome would have been more favorable for the Tribe if the evidence about KTS's calling card had not been admitted.

## CONCLUSION

[¶54] BCR did not comply with the procedural requirements of Rule 11, and the district court erred when it imposed Rule 11 sanctions on the Tribe. The district court's order imposing Rule 11 sanctions is reversed, and this matter is remanded to the district court with direction that the order imposing sanctions be vacated. We affirm the district court's order granting summary judgment on the accounting claim because the Tribe could not bring a cause of action for an accounting under W.R.P.C. 1.15(e), and the Tribe failed to show its conversion and civil theft claim was not an adequate remedy at law. We affirm the jury's verdict after finding the Tribe failed to show the verdict would have been more favorable to the Tribe if the racially charged evidence and argument had not been admitted.